**CONNERS MARINE CO., Inc., v. PENNSYL-VANIA R. CO. et al.**

**Petition of CARROLL TOWING CO., Inc.**
**THE JOSEPH F. CARROLL.**
**Nos. 17073, 17133.**

District Court, E. D. New York.

Feb. 6, 1946.

Supplemental Opinion March 12, 1946.

Purdy & Lamb, of New York City, (Edward F. Lamb, of New York City, of counsel), for Conners Marine Co., Inc.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for Pennsylvania R. Co.

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New

York City, of counsel), for Grace Line, Inc.

Foley & Martin, of New York City, (Christopher E. Heckman and L. J. Lawrence, both of New York City, of counsel) for Carroll Towing Co., Inc.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y. (Eugene F. Russell, Sp. Atty., Department of Justice, of New York City, of counsel), for the United States.

MOSCOWITZ, District Judge.

On June 2, 1943, the libellant, Conners Marine Co., Inc., as owner of the covered barge Anna C. entered into an agreement with the respondent, Pennsylvania Railroad Company, wherein the libellant agreed to let and charter the Anna C to the respondent and the respondent agreed to charter and lease the Anna C from the libellant for an indefinite period of time at an agreed rate of charter hire per diem. This was the usual oral harbor charter. The Anna C was delivered to the respondent in good condition and returned in damaged condition on or about January 5, 1944.

On January 2, 1944, the Anna C, loaded with flour owned by the United States of America, was left at Pier 58 Manhattan, North River, to which pier she had been consigned. Subsequently she was shifted from Pier 58 to Pier 52 and left on the end of Pier 52. Five other barges were subsequently placed outside of the Anna C. Four barges lay at the Public Pier to the north of Pier 52. In order to strengthen the moorings of the barges at the end of Pier 52, a line was run from the barge O'Hara, the fourth barge of the tier, to the barge Erie R. R., the latter barge the fourth barge in a tier of four barges at the end of the Public Pier, the Public Pier being to the north of Pier 52. The position of the six barges or scows at the end of Pier 52 and the four barges or scows at the Public Pier are shown in the diagram, Conners Marine Co., Inc., Exhibit 1. The Anna C had one line out to Pier 52 from its down-river corner which was doubled up in three parts. She had another line which was in a single part from its up-river corner to the corner of the pier. These lines were practically new, in good condition and were from 5½ to 6 inches.

On January 4, 1944, Burn, a harbor master employed by the Grace Line, Inc., ordered the tug Joseph F. Carroll, which was working as a shifting tug for the Grace Line, Inc to shift the barge Camden, being the second barge in the tier of four at the end of the Public Pier, to a designated berth at Pier 58, North River. At this time the tide was at the strength of the ebb. The captain of the Carroll on arriving at the end of Pier 52 saw the line running between the tiers of boats on the two piers and concluded that it was necessary to remove this line which was obstructing the tug Carroll's way into the Camden. Thereupon the captain of the Carroll placed the harbor master who was riding on the tug and his deckhand on the tier of barges at the end of Pier 52. The deckhand and Brun, the harbor master, went on the tier of boats at the end of Pier 52 and readjusted the lines between the boats at the end of Pier 52, taking in slack and doubling up some of the lines and readjusting the lines between the Anna C at the end of Pier 52. After completing this, either the harbor master or the deckhand or both threw off the lines between the two tiers of boats and returned to the tug. The tug master, without inquiring, assumed that the condition was safe and moved the tug from the tier of boats at the end of Pier 52, to which the tug Carroll had previously been made fast with a line from the tug to the Pennsylvania R R, the end boat of the tier, and upon which the tug had kept a strain to hold up the boats while the harbor master and deckhand were adjusting the lines between the boats at the end of Pier 52 and readjusting the lines between the Anna C and the end of Pier 52. The tug had moved away about 75 feet from the tier of boats when the tier broke adrift.

Prior to the time that the harbor master and the deckhand of the tug adjusted the lines, the Anna C was safely made fast and lying properly. Had they left the Anna C as she was, there would have been no accident. Had they adjusted her lines properly and also had another

line been placed between the two tiers or another tug been used to assist the Carroll, there would have been no accident. In order to obtain access to the Camden, which was to be removed from the Public Pier, it was necessary to remove the line extending between the barge Erie R. R., moored at the Public Pier, and the barge O'Hara, moored at Pier 52. The duty of the harbor master was to give orders to the tug and to aid and arrange the lines. It is not clear from the testimony whether the deckhand of the tug or the harbor master actually removed the lines from the barges at the Public Pier and Pier 52. However, there was an understanding between the harbor master, the master of the tug and the deckhand that that was a necessary operation. The harbor master and the deckhand required no specific directions from the master of the tug to rearrange the line on the Anna C. This was a voluntary act on the part of the harbor master; it was his custom and his duty to perform such tasks and while so performing he was not acting in the capacity of a deckhand of the tug; he was acting in his capacity as an employee of Grace Line, Inc. If he had been acting merely as a deckhand assisting the master of the tug, although employed as harbor master by Grace Line, Inc., there would be no liability on the part of Grace Line, Inc. However, it appears that his duties were quite different. It was his duty, jointly with that of the master of the tug, to give orders and directions. This had been his custom, it is assumed, with the knowledge and consent of his employer, Grace Line, Inc. It appears from the proof that in this undertaking, which was negligently performed, the tug and the harbor master were acting together and the tug and Grace Line, Inc., should be held jointly responsible.

■■■ At the time the lines were shifted by the harbor master and the deckhand on the Anna C, it is believed that the captain of the barge Anna C was absent. The testimony is in conflict with reference to this. The absence of the captain of the Anna C did not in any wise contribute to the accident. He was not required to anticipate negligence of the harbor master, the master and deckhand of the tug Carroll. Under the circumstances here disclosed, the absence of the captain is not in itself negligence. See The Kathryn B. Guinan, 2 Cir., 176 F. 301; United States Trucking Corporation v. City of New York, D. C., 14 F.2d 528; Schmutz v. Pennsylvania Railroad Company,[1] 1926; The Baltimore,[1] 1934; The Trenton, 2 Cir., 72 F. 283.

It is doubtful that the tug and Grace Line, Inc., should have undertaken the operation of removing the Camden without either securing an additional tug or placing a line from the barge O'Hara at Pier 52 to another one of the barges at the Public Pier. The removal of the line between the barges at Pier 52 and the Public Pier placed a strain upon the lines of the Anna C. The accident was caused through the joint fault of the tug Carroll in not properly protecting the Anna C while engaged in the removal of the Camden from the Public Pier. If a line had been placed from the barge O'Hara at Pier 52 to one of the barges at the Public Pier or if the lines of the Anna C had been properly adjusted by the harbor master and the deckhand or if another tug had been used, the accident would have been avoided. It has been stipulated that the Carroll Towing Line, Inc., is entitled to limitation of its liability.

■■ The libellant, Conners Marine Co. Inc., as the owner of the barge Anna C, is entitled to recover damages sustained by it from the Carroll Towing Line, Inc., as owner of the tug Joseph F. Carroll, and from Grace Line, Inc., primarily, and from Pennsylvania Railroad Company, the charterer of the said barge, secondarily.

■■ The United States of America is entitled to a decree for damage to the cargo.

### Findings of Fact.

1. Libellant, Conners Marine Company, Inc., is a domestic corporation and was and still is the owner of the covered barge Anna C.

---

[1] No opinion for publication.

2. Respondent, Pennsylvania Railroad Company, is a corporation and has goods, chattels and credits within this district.

3. On or about June 2, 1943, the libellant made and entered into an agreement with the respondent whereby the libellant agreed to let and charter the covered barge Anna C to the respondent and the respondent agreed to charter and lease the said barge from the libellant for an indefinite period of time at an agreed rate of charter hire per diem. The libellant delivered the said barge to the respondent and the respondent accepted the delivery thereof from the libellant.

4. The agreement of the charter and the delivery of the barge to the respondent constituted a demise.

5. At the time of the delivery of the barge she was tight, staunch and seaworthy.

6. Respondent remained in possession and control of the barge until January 5, 1944, when the barge was returned by the respondent to the libellant in a sunken and damaged condition.

7. This damage was not the result of ordinary wear and tear.

8. On January 2, 1944, the barge Anna C, loaded with flour owned by the United States of America, was left at Pier 58 Manhattan, North River. Subsequently she was shifted to Pier 52 and left at the end of the pier. Five other barges were subsequently placed outside of the Anna C. Four barges lay at the Public Pier to the north of Pier 52. The Anna C was made fast to the pier end with a line from the down-river end of the Anna C to the down-river end of Pier 52 doubled up in three parts, and with a line from the up-river end of the Anna C to the up-river end of the pier in a single part. These lines were 5½ to 6 inch lines and in good condition. There was also a line running from the fourth boat out in the tier of boats on the end of Pier 52 to the fourth and last boat out of the tier on the end of the Public Pier.

9. The aforesaid vessels lay made fast in the fashion described until on the afternoon of January 4 on the strength of the ebb tide the tug Joseph F. Carroll, which was under charter to the Grace Line as a shifting tug, pursuant to orders from the Grace Line, came down to the said boats for the purpose of getting the scow Camden, which was the second boat out from the end of the Public Pier, to bring the scow up to the Grace Line piers. There was on board the tug Joseph F. Carroll at the time, in addition to her crew, a harbor master in the employ of Grace Line, Inc.

10. The tug Joseph F. Carroll, desiring to enter between the two tiers of boats, and finding its way obstructed by the line stretching between the two tiers, went alongside the outside boat at Pier 52 and ran a line from the stem of the tug to the middle bitt of the said boat, keeping a strain on the said line by working its engines slow ahead. The captain of the Carroll then put the deckhand of the tug and the harbor master aboard the boats at the end of Pier 52 to throw off the line between the two tiers of boats after first ascertaining if it would be safe to do so. There was a strong northerly wind blowing at the time. The harbor master of the Grace Line and the deckhand went aboard the said tier of boats and readjusted the lines on the said tier of boats to their satisfaction, including the lines from the Anna C to the end of the pier and then threw off the line between the two tiers of boats.

11. When the deckhand and the harbor master came back on board the tug the captain of the tug immediately released the tug's line from the outside boat of the tier and proceeded to enter between the two tiers to get the Camden. Before the tug arrived abreast of the Camden and before the tug had proceeded any further than 75 feet away from the said tier of boats at the end of Pier 52, the said tier went adrift as a unit. The Joseph F. Carrol[1] immediately came back and again got a line on the outside boat to try to shove the boats back to the end of Pier 52, but the inside end of the tier sagged downstream, and the end of the barge Anna C came into contact with the stern of a Navy tanker which was lying on the north

side of Pier 51 immediately below, in consequence of which the Anna C received damage at and near the bottom under the water line from which she shortly sank after being pushed into the slip between Pier 52 and Pier 51 by the tug Grace, which had come to the assistance of the tug Joseph F. Carroll.

## Conclusions of Law.

1. The breaking adrift of the tier of boats at the end of Pier 52 was due to the negligence of the tug Joseph F. Carroll and of the harbor master of the Grace Line in throwing off the line between the two tiers of boats, and in failing to properly secure the boats at the end of Pier 52 under the conditions of wind and tide before doing so. If the tug Joseph F. Carroll was unable safely to perform the contemplated maneuver she should have obtained additional tug boat assistance before undertaking it.

2. The Grace Line, as the employer of the harbor master, is responsible for his negligence.

3. The libellant, Conners Marine Co., Inc., as the owner of the barge Anna C, is entitled to recover the damages sustained by it from the Carroll Towing Line, Inc., as owner of the tug Joseph F. Carroll, and from Grace Line, Inc., primarily, and from Pennsylvania Railroad Company, the charterer of the said barge, secondarily.

4. Carroll Towing Line, Inc., as owner of the Joseph F. Carroll, is entitled to limitation of its liability.

5. The claim of the United States of America should be allowed in full in the limitation proceeding.

6. Settle decree on notice.[2]

## Supplemental Opinion.

MOSCOWITZ, District Judge.

An opinion was filed herein on February 6, 1946. The Court makes the following additional finding of fact and conclusion of law, submitted by the Pennsylvania Railroad Company, respondent and claimant:

### Finding of Fact.

As a result of the sinking of barge Anna C. on June 4, 1944, The Pennsylvania Railroad Company was obliged to incur expenses in connection with the raising of the Anna C amounting to approximately $2,000, for which claim has been made in the petition of Carroll Towing Company, Inc., as owner of steamtug Joseph F. Carroll, for limitation of liability.

### Conclusion of Law.

The expenses incurred by the Pennsylvania Railroad Company in connection with the salvage of the barge Anna C and her cargo should be allowed in full in the limitation proceeding.

The Court has been advised by letter[3] dated March 8, 1946, from Frederic Conger, Esq., of counsel, Burlingham, Veeder, Clark & Hupper, proctors for the Pennsylvania Railroad Company, that there is no objection to the Court making the above additional fining of fact and conclusion of law.

---

[2] If it be deemed that any additional findings of fact or conclusions of law are necessary, they may be submitted on notice.

[3] This letter has been filed in the Clerk's office.